**Opinion issued August 6, 2020**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

## NO. 01-18-00816-CR

———————————

**KEVIN UNTRAY HINES, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 240th District Court**
**Fort Bend County, Texas**
**Trial Court Case No. 15-DCR-070996B**

## O P I N I O N

A jury convicted appellant, Kevin Untray Hines, of the third-degree felony

offenses of theft of property valued between $20,000 and $100,000 and

misapplication of fiduciary property valued between $20,000 and $100,000.[1] The trial court assessed appellant's punishment at ten years' confinement, suspended the sentence, and placed appellant on community supervision for ten years. The trial court also ordered appellant to pay $22,000 in restitution. In four issues on appeal, appellant contends that (1) the trial court erred by admitting emails between the complainant and a third person because these emails were not properly authenticated; and in issues (2)–(4) appellant contends the trial court erred by denying appellant's motion to quash the indictment because the indictment failed to adequately describe certain terms, including "money," the act or acts relied upon by the State to constitute criminal conduct, and the manner and means by which appellant "appropriated" money from the complainant.

We affirm.

## Background

### A.     *Factual Background*

The complainant, Herbert Pair, lives in Mobile, Alabama, and owns a printing business and an art gallery. In 2013, the printing business was having financial difficulties. Pair thought about obtaining a loan, which he could use to buy new

---

[1]     *See* TEX. PENAL CODE ANN. § 31.03(a) ("A person commits an offense [of theft] if he unlawfully appropriates property with intent to deprive the owner of property."), § 32.45(b) ("A person commits an offense [of misapplication of fiduciary property] if he intentionally, knowingly, or recklessly misapplies property he holds as a fiduciary . . . in a manner that involves substantial risk of loss to the owner of the property or to a person for whose benefit the property is held.").

equipment, repair the building where the business was located, advertise, and take other measures to increase revenue, but he did not believe that a traditional bank would extend credit to him, in part due to general economic conditions at the time and also because he was not a good credit risk. Around this time, Pair spoke with a friend who told him that he "knew several people, different people [Pair] could network with" to obtain a loan. This friend told Pair about appellant, who lived in the Houston area and had experience with small business development and financial planning.

Pair began communicating with appellant in February 2013 about appellant's methods for helping businesses such as Pair's. Appellant explained to Pair that he could "get loans for smaller businesses through nontraditional methods." These methods would not rely on Pair's credit score, but would instead "look at how much money [the business is] generating, how much [in] deposits [the business is] actually making," and those factors would determine creditworthiness. Appellant told Pair that he acted as a type of broker for banks and that Pair could not simply send the banks copies of his bank statements and other financial records. Appellant told Pair that, instead, appellant would open a joint bank account in both of their names, Pair would make deposits into that joint account, and banks could see that Pair's business had a positive cash flow and would then loan money to Pair. The parties agreed that if Pair followed this procedure and transferred funds to a joint account, appellant

3

would ensure that Pair received a $400,000 loan for his business. When Pair received the loan, all of the transfers he had made to the joint account would be returned to him.

Pair first sent money to appellant in May 2013. Appellant and Pair communicated mostly by phone, although they occasionally sent text messages and, later, emails. Appellant and Pair never met in person, but when Pair searched for appellant on social media, he discovered that they both had an interest in music ministry, which increased Pair's trust in appellant.

Pair authorized appellant to open a joint bank account in both of their names with First Convenience Bank. Appellant opened an account at a branch in Missouri City, Texas. Pair was not present when appellant opened the account in May 2013, he never received any records from the bank, he never signed any signature cards, he never had access to a debit card for this account, and he never gave written authorization for appellant to open the account. The trial court admitted account records demonstrating that appellant was the only signatory on the account. The signature card for the account listed a phone number and an email address for appellant that Pair had used to correspond with appellant.

Pair first wired $500 from his bank account to the First Convenience account on May 27, 2013. The trial court admitted bank records showing this wire transfer, as well as all other transfers Pair made to the First Convenience account. In these

4

records, Pair was listed as the "originator" of the transfer, and appellant was listed as the "beneficiary." Ultimately, Pair transferred over $22,000 to the First Convenience account from May 2013 through August 2013.

Records for the First Convenience account showed that, around the time Pair was wire-transferring funds from Alabama, debits were made from the account at retail locations around Houston, for plane tickets, and for other expenses. Pair testified that appellant was not authorized to withdraw money from this account, and he did not agree to allow appellant to pay his personal expenses from this account.

Pair did not receive a $400,000 loan, nor did appellant refund the $22,000 Pair had wire-transferred to the joint account. When Pair did not receive the promised loan, he contacted appellant to try to get his money back. Appellant told Pair that the problem was that "the bank is not living up to their obligations—this lending institution is not doing what they are supposed to do." In an attempt to recover at least some of the funds he had transferred, a frustrated Pair wrote two checks on the account, payable to him and to his business, and signed appellant's name. These checks were not paid by First Convenience. Appellant continued contacting Pair by text message into 2014 in order for Pair to deposit more funds into the joint account, but Pair did not have any more money. Pair testified that some of the funds that he wire-transferred to the First Convenience account came out of a joint account that he had with an elderly uncle in Alabama.

5

Eventually, in the spring of 2014, Pair went to the police in Mobile. He provided the police with text messages he had exchanged with appellant, emails, and the receipts from the wire-transfers he had made. The Mobile Police Department determined that it did not have jurisdiction over the case, and it forwarded the case to the Missouri City, Texas Police Department. The trial court admitted copies of the text messages exchanged between Pair and appellant.

Appellant testified on his own behalf. He stated that he was introduced to Pair in February 2013 through a family friend, who was living with appellant at the time in Missouri City, when Pair called appellant's phone and asked to speak with appellant's friend. Appellant stated that this family friend had access to his cell phone and his tablet, both of which could receive emails and text messages. Appellant testified that he next spoke with Pair in May 2013 and Pair seemed "down on his luck," but Pair did not mention any financial difficulties, and they did not discuss the possibility of appellant's obtaining a loan for Pair. Appellant acknowledged that he opened a bank account for Pair with First Convenience, but he stated that he mailed all account documentation, checks, and debit cards to Pair, and Pair had access to the account. According to appellant, Pair asked him to open the account because Pair was planning to move to the Houston area.

Appellant acknowledged that Pair sent money to him in 2013, and he stated that Pair did so because he wanted to be in a relationship with appellant. He stated

6

that he accessed some of the funds in the account, but he did so with Pair's permission. Appellant characterized Pair's expectation of receiving a loan as "a scheme that was put together by [Pair] to state that when his uncle found out that the money was gone [from the joint account Pair had with his uncle], [Pair] just needed a way to come up with the money." He acknowledged sending text messages to Pair concerning money, but he stated that Pair "coerced" him into sending these messages due to Pair's troubles with his uncle. He also stated that his family friend, who had access to his phone, "knew what was going on" and would occasionally send texts to Pair from appellant's phone at Pair's request. Appellant also testified that he started sending money back to Pair in August or September 2013.

## B.   *Procedural Background*

### 1.   **Motion to Quash Indictment**

A grand jury indicted appellant in December 2017. The indictment stated:

The duly organized Grand Jury of Fort Bend County, Texas, presents in the District Court of Fort Bend County, Texas, that in Fort Bend County, Texas, **KEVIN UNTRAY HINES**, hereafter styled the Defendant, heretofore on or about, and between **May 1, 2013 and July 10, 2014**,

Count I

pursuant to one scheme and continuing course of conduct, did, unlawfully appropriate property, namely, money of the aggregate value of $20,000 or more but less than $100,000.00, from Herbert Pair, hereinafter referred to as the owner, without the effective consent of the owner, and with the intent to deprive the owner of the property;

Count II

7

then and there intentionally, knowingly, or recklessly misapply property, to-wit: money, of the value of $20,000 or more but less than $100,000, that the said defendant held as a fiduciary or as a person acting in a fiduciary capacity, but not as a commercial bailee, contrary to an agreement under which the said defendant held the property, and in a manner that involved substantial risk of loss of the property to Herbert Pair, the owner of said property, and the person for whose benefit the property was held, by withdrawing money from the bank account without the consent of Herbert Pair and spending money from the bank account without the consent of Herbert Pair.

In March 2018, appellant filed an original and amended motion to quash the indictment. In his amended motion, appellant argued that the indictment was insufficient as a matter of law because it did not sufficiently describe the alleged criminal conduct and it did not provide adequate notice of the charges against him. Specifically, appellant argued that the Penal Code defines "appropriate" in two ways, but the indictment did not specify the means by which appellant allegedly appropriated Pair's property. Appellant also argued that the indictment was insufficient because it did not specify the form of "money" allegedly appropriated by appellant, it did not specify how appellant allegedly misapplied Pair's property, and it did not specify the particular bank account from which appellant allegedly withdrew the money. After a hearing, the trial court denied appellant's motion to quash.

## 2.   Admission of Emails

During Pair's direct testimony, the State offered Exhibit 4, a series of emails between Pair and "a Vanessa Smith." Pair testified that appellant had represented

8

that Vanessa Smith was his partner or assistant.[2] Pair stated that he had never met Vanessa Smith, and he agreed with the State that he never "independently contact[ed] Vanessa Smith before he contacted" appellant. The trial court admitted this exhibit without objection.

This exhibit begins with three emails between appellant, using the same email address that he had listed on the signature card for First Convenience, and a person purporting to be "Vanessa Smith <Vanessa.Smith@consultant.com>." These emails are dated July 2, 2013, and the subject line for the emails states, "Client Mr. Herbert E. Pair." In the first email, Smith asks appellant a couple of questions about the account, states that Pair had missed three payment deadlines, states that Smith needs "[her] fee paid up front," and states that, while she normally "charge[s] 10,000.00 on such a high amount[, she] will need [an] additional $1900.00 before [she] process[es] this loan." Appellant responded[3] and stated:

> Now I [brought] my client [Pair] to you with hopes that we can get this loan done in a timely manner. I do apologize on behalf of Mr. Pair[,] he is the caretaker of his elderly Mother so with the deadline not being met on time I do apologize. Now after he pays you the closer fee of the $1900.00 then you will process the loan? We may have to see about going with another lender, I understand your fees which I personally

---

[2]   Appellant testified: "I don't know who Vanessa Smith is. That's an email that I just received one day and [Pair] stated that that was someone that I should talk with because that's the e-mail that he created." He stated that he has never met a Vanessa Smith and that he believes Pair is Smith.

[3]   Appellant acknowledged that this email was sent from his account, but he denied being the one who composed this email.

9

paid you upfront. We will review other options if my client is willing to wait on the loan. I will call you after 2 pm with a decision[.]

Smith responded back and asked appellant to consult with Pair. Appellant forwarded these three emails to Pair. Pair testified that these emails convinced him that the endeavor with making transfers to the joint account in order to obtain a loan was legitimate, stating, "Because this is a third party. It's not just between myself and Mr. Hines. This is a third party who has entered into the picture to confirm."

The remainder of the emails in Exhibit 4 were between Pair and Smith and occurred throughout July 2013. The emails referenced appellant, including health problems that he was having.[4] They discussed the loan Pair was to receive and a potential payment schedule, transfers Pair was making to the First Convenience account, and interest rates for the loan. Smith did not identify herself as being associated with a particular business, and her emails are full of grammatical errors and spelling mistakes. The tone of these emails, however, is amicable.

The State then sought to offer Exhibit 5, another series of emails between Pair and Vanessa Smith. Defense counsel conducted a voir dire examination of Pair:

Q:    Mr. Pair, as to State's Exhibit No. 5, have you—have you ever actually met Vanessa Smith?

A:    No.

Q:    Now, do you know whether or not this is a legitimate account from a Vanessa Smith?

---

[4]    Appellant was diagnosed with pancreatic cancer in 2012.

10

A:    No, I do not.

Q:    So all of these e-mails from this Vanessa Smith, you can't verify whether or not Vanessa Smith actually sent them to you or not, right?

A:    I cannot verify that Vanessa Smith exists.

Q:    You cannot verify that a Vanessa Smith exists. Is that what you're saying?

A:    Yes.

Q:    So how do we know that these e-mails are legitimate, that they're actually on the up and up, you know, that they're actually true? How do we know that?

A:    We don't know.

Defense counsel objected on the basis that the emails in Exhibit 5 had not been properly authenticated.

Before the trial court ruled on this objection, the State questioned Pair further about the emails:

Q:    Without getting into too much of the contents of the e-mail, Mr. Pair, previously in State's Exhibit No. 4 we saw an e-mail from Vanessa.Smith@consultant.com; is that right?

A:    Yes.

Q:    And that was forwarded to you by Kevin Hines?

A:    Yes.

Q:    And tell me how Kevin Hines described Vanessa Smith to you.

A:    As his business partner.

Q:    And were you permitted to converse directly with Vanessa Smith at a later date?

A:    Yes.

11

Q: And you believed to be conversing with a Vanessa.Smith@consultant.com, the same person that you had previously had communications with in State's Exhibit No. 4?

A: Yes.

Q: Did Mr. Hines hold out—well—now, we talked about whether this—whether this e-mail is legitimate or not. Where did you get this e-mail from? Did it just materialize from thin air or did it come to your e-mail address?

A: No, it was forwarded to me from Kevin Hines.

Q: We're talking about State's Exhibit No. 5. This correspondence chain in State's Exhibit No. 5, were you one of the parties to that e-mail exchange?

A: Yes.

Q: And your account . . . that is a legitimate account?

A: Yes.

Q: That's you, isn't it?

A: Yes.

Q: And so whoever you're conversing with, whether they are Vanessa Smith or not, it is a conversation that's happening between you and this entity; is that right?

A: Yes.

. . . .

Q: As far as you are concerned, Mr. Pair—well, Mr. Pair, as far as you're concerned, Vanessa Smith was working with Mr. Hines?

A: Yes.

Q: And if Vanessa Smith is a real person, do you believe she conspired with Kevin Hines to take your money?

A: Yes.

Q: But this is a real printout from your account; is that right?

12

A:     Yes.

The State offered Exhibit 5 into evidence.

Defense counsel argued that, to authenticate the emails in Exhibit 5, the State should have "brought in the person from AOL or whoever, you know, was controlling these accounts." The trial court responded, "[I]t's being represented as under [Texas] Rule [of Evidence] 901, this is what it purports to be. This is what was purportedly sent to [Pair] for purposes of probably notice or state of mind as to this witness. And as such I think it goes to the weight, but not the admissibility . . . ." The court then stated:

> Under 901 you meet the baseline predicate if the thing is what it purports to be and [Pair is] purporting that's what he got, whether this person does exist or doesn't exist or somebody else or any other person it could be that might be involved in this. It is what he received that was the basis of why he did what he did. And for that purpose it meets the criteria for Rule 901.
>
> Now, as to the other things that you pointed out during voir dire that is full open game for the weight to be given to whatever this exhibit is.

The trial court overruled the objection and admitted State's Exhibit 5.

In the emails contained in Exhibit 5, which were sent in August 2013, Pair and Smith discussed the amount of the loan, the possibility of Pair increasing the amount of the loan in order to purchase an old apartment complex, information about more wire transfers to the joint account, and questions from Pair about paperwork and payment of the loan. In early September 2013, Pair and Smith discussed how he

13

had not received any money. Pair stated, in all capital letters, "I HAVE WAY OVER EXTENDED MYSELF TO GET THIS AND HAVE NOTHING ABSOLUTELY NOTHING TO SHOW FOR IT." He also expressed frustration that appellant had never given him the name of the loan company that was purportedly involved. Smith refused to give Pair the name of the loan company, stating, "You can't call them." Over the next several months, Pair's emails to Smith became increasingly irate, and he threatened to have a lawyer become involved.[5]

Ultimately, the jury found appellant guilty of both counts in the indictment: theft of property valued between $20,000 and $100,000 and misapplication of fiduciary property valued between $20,000 and $100,000. The trial court assessed appellant's punishment at ten years' confinement, suspended the sentence, and placed appellant on community supervision for ten years. This appeal followed.

## Authentication of Email Evidence

In his first issue, appellant contends that the trial court erred by admitting State's Exhibit 5, a series of emails between Pair and Vanessa Smith because these emails were not properly authenticated. Specifically, appellant argues that because Pair testified that he never met Smith, that he did not know if that email address was

---

[5] In January 2014, after Pair and Smith had exchanged no emails for a few months, their correspondence began again. In one email, Pair noted that he had not talked to Smith since September, and he stated, "You sound like [appellant] trying to be two people at the same time."

legitimate, and that he did not know if Smith was actually a real person, Pair could not authenticate the emails contained in Exhibit 5.

## A. *Standard of Review*

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). A trial court abuses its discretion when its decision falls outside the zone of reasonable disagreement. *Id.* at 83. Before a reviewing court may reverse a trial court's evidentiary ruling, it must conclude that the trial court's ruling "was so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Id.* (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008)).

Whether to admit a particular piece of evidence is a preliminary question to be determined by the trial court. *See* TEX. R. EVID. 104(a) ("The court must decide any preliminary question about whether . . . evidence is admissible."); *Tienda v. State*, 358 S.W.3d 633, 637–38 (Tex. Crim. App. 2012). For evidence to be admissible, it must be relevant, i.e., it must have a tendency to make a fact of consequence to determination of the action more or less probable. *Tienda*, 358 S.W.3d at 638; TEX. R. EVID. 401. A key component of relevance is authentication: "Evidence has no relevance if it is not authentically what its proponent claims it to be." *Tienda*, 358 S.W.3d at 638. Authentication is a condition precedent to the admissibility of evidence and requires the proponent of the evidence to "produce

evidence sufficient to support a finding that the item is what the proponent claims it is." TEX. R. EVID. 901(a); *Butler v. State*, 459 S.W.3d 595, 600 (Tex. Crim. App. 2015); *Tienda*, 358 S.W.3d at 638; *Jones v. State*, 466 S.W.3d 252, 261 (Tex. App.— Houston [1st Dist.] 2015, pet. ref'd) ("As a condition precedent to admissibility, the proponent of the evidence must satisfy the requirement of authentication by showing that 'the matter in question is what its proponent claims.'").

Rule 901(b) lists several non-exclusive examples of evidence that satisfies the authentication requirement, including "[t]estimony that an item is what it is claimed to be." TEX. R. EVID. 901(b); *Tienda*, 358 S.W.3d at 638 ("Evidence may be authenticated in a number of ways, including by direct testimony from a witness with personal knowledge, by comparison with other authenticated evidence, or by circumstantial evidence."). Evidence can be authenticated by appearance, contents, substance, internal patterns, or other distinctive characteristics, including direct or circumstantial evidence. *Sennett v. State*, 406 S.W.3d 661, 669 (Tex. App.— Eastland 2013, no pet.); TEX. R. EVID. 901(b)(4). "An e-mail may be properly authenticated if its appearance, contents, substance, or other distinctive characteristics, taken in conjunction with the circumstances, support a finding that the document is what the proponent claims it to be." *Sennett*, 406 S.W.3d at 669; *Manuel v. State*, 357 S.W.3d 66, 75 (Tex. App.—Tyler 2011, pet. ref'd). "Conversations and events that precede or follow the communications at issue, when

identified or referred to within the written communication, can provide contextual evidence demonstrating the authenticity of such communications." *Butler*, 459 S.W.3d at 604.

The ultimate question of whether a particular item of evidence is what its proponent claims is a question for the fact finder. *Tienda*, 358 S.W.3d at 638; *see Butler*, 459 S.W.3d at 600. The Court of Criminal Appeals has stated:

> In performing its [Texas] Rule [of Evidence] 104 gate-keeping function, the trial court itself need not be persuaded that the proffered evidence is authentic. The preliminary question for the trial court to decide is simply whether the proponent of the evidence has supplied facts that are sufficient to support a reasonable jury determination that the evidence he has proffered is authentic.

*Tienda*, 358 S.W.3d at 638; *Jones*, 466 S.W.3d at 262. If the trial court's ruling that a jury could reasonably find a proffered item of evidence authentic is "at least 'within the zone of reasonable disagreement,'" we should not interfere and reverse the ruling. *Tienda*, 358 S.W.3d at 638; *Druery v. State*, 225 S.W.3d 491, 502 (Tex. Crim. App. 2007) ("The trial judge does not abuse his or her discretion in admitting evidence where he or she reasonably believes that a reasonable juror could find that the evidence has been authenticated or identified.").

**B.    *Analysis***

Pair testified that appellant had told him that he would act as a broker and work with financial institutions in an attempt to obtain a loan for Pair. The trial court admitted, without objection, State's Exhibit 4, a series of emails from July 2013

between a person purporting to be "Vanessa Smith," appellant, and Pair. The first three emails, all dated July 2, 2013, were between "Vanessa Smith" and appellant. The first email was sent from "Vanessa Smith <Vanessa.Smith@consultant.com>" to appellant's email address and had a subject line that stated "Client Mr. Herbert E. Pair." In this email, Smith asked questions about the First Convenience account—such as how long the account had been open and whether $500 was being deposited into the account on a monthly basis. It stated that Pair had "3 missed deadlines" which prompted Smith to request that her "fee [be] paid up front," and it stated that "[w]hile [she] normally charge[s $]10,000.00 on such a high amount[, she] will need [an] additional $1900.00 before [she] process[es] this loan."

Appellant responded and stated:

Now I [brought] my client [Pair] to you with hopes that we can get this loan done in a timely manner. I do apologize on behalf of Mr. Pair[,] he is the caretaker of his elderly Mother so with the deadline not being met on time I do apologize. Now after he pays you the closer fee of the $1900.00 then you will process the loan? We may have to see about going with another lender, I understand your fees which I personally paid you upfront. We will review other options if my client is willing to wait on the loan. I will call you after 2 pm with a decision[.]

Smith then replied that she understood, that she was being "[very] fair with [her] fee," and that appellant should discuss the matter with Pair. Appellant forwarded these three emails to Pair later the same day. The remainder of the emails contained in Exhibit 4 are between Pair and "Vanessa Smith," are dated throughout July 2013, and repeatedly reference the loan that Pair was trying to obtain and wire-transfers by

18

Pair into the First Convenience account, as well as appellant and appellant's health issues.

State's Exhibit 5 contains a series of emails between Pair and "Vanessa Smith" ranging from August 6, 2013, to March 6, 2014, with no emails being sent between mid-October 2013 and early January 2014. The emails from Smith were sent from the same account as the emails contained in Exhibit 4—Vanessa.Smith@consultant.com—and the emails continued to reference the attempt to obtain a loan, wire-transfers by Pair, appellant, and appellant's health concerns. Pair repeatedly attempted to learn the name of the financial institution that was involved, and Smith repeatedly rebuffed him. Pair's emails from August and early September were amicable, but, as the process dragged on, he became increasingly irritated and irate, and the remainder of his emails to Smith reflect this frustration.

On voir-dire examination, Pair agreed with defense counsel that he had never met Vanessa Smith, that he did not know if the email address purportedly used by Vanessa Smith was a legitimate account for her, and that he did not know if Smith actually existed. Defense counsel thus objected to Exhibit 5 on the basis that the emails contained in that exhibit were not properly authenticated. On questioning by the State, Pair testified that appellant had described Smith as his business partner, that the first emails from Smith to appellant—which reference the loan transaction that Pair was trying to complete—were forwarded to Pair by appellant, that he later

19

directly conversed with Smith by email, and that he believed the person he was conversing with in the emails contained in Exhibit 5 was the same "Vanessa Smith" who authored the emails contained in Exhibit 4.

Appellant argues that Pair could not authenticate the emails contained in Exhibit 5 because he admitted that he did not know whether "Vanessa Smith" existed or her email address was legitimate, and therefore Pair did not have the "personal knowledge" necessary to authenticate the emails. However, the trial court also admitted Exhibit 4, a series of emails, some of which were purportedly from "Vanessa Smith" and were sent to both appellant and, later, Pair. Appellant did not object to the admission of Exhibit 4. The emails from "Vanessa Smith" in Exhibit 4 and Exhibit 5 were sent from the same email address and referenced a continuing transaction. Several of the emails referred to appellant and his health concerns, and the initial emails from Smith in Exhibit 4 were sent directly to appellant, who forwarded the emails to Pair, who then began corresponding directly with "Vanessa Smith." Pair's direct correspondence with Smith—contained in both Exhibit 4 and Exhibit 5—all references the same potential loan transaction and are clearly part of one chain of email communications began by Smith on July 2, 2013. Moreover, whether the emails sent to Pair contained in Exhibit 5 were actually sent from a person named "Vanessa Smith" is irrelevant. The importance of the emails is that they referenced the potential loan transaction and that Pair received them, leading

him to continue to believe that appellant's plan to obtain a loan for Pair by having Pair make wire-transfers to the First Convenience account was legitimate and not a scam.

Given the close relationship between the emails contained in Exhibit 4 and those contained in Exhibit 5, we conclude that the trial court reasonably could have determined that the State, as the proponent of Exhibit 5, supplied facts sufficient to support a reasonable jury determination that Exhibit 5 is authentic. *See Tienda*, 358 S.W.3d at 638; *Jones*, 466 S.W.3d at 262. The emails in Exhibit 4, admitted without objection, provide context for the emails in Exhibit 5, which address the same loan transaction. *See Butler*, 459 S.W.3d at 604 ("Conversations and events that precede or follow the communications at issue, when identified or referred to within the written communication, can provide contextual evidence demonstrating the authenticity of such communications."); *Sennett*, 406 S.W.3d at 669 ("An e-mail may be properly authenticated if its appearance, contents, substance, or other distinctive characteristics, taken in conjunction with the circumstances, support a finding that the document is what the proponent claims it to be."). We hold that the trial court did not abuse its discretion by making a preliminary ruling that the emails in Exhibit 5 were authentic. *See Tienda*, 358 S.W.3d at 638; *Druery*, 225 S.W.3d at 502 ("The trial judge does not abuse his or her discretion in admitting evidence

where he or she reasonably believes that a reasonable juror could find that the evidence has been authenticated or identified.").

We overrule appellant's first issue.

**Motion to Quash the Indictment**

In his second, third, and fourth issues, appellant contends that the trial court erred by denying his motion to quash the indictment. Specifically, he argues that, with respect to the misapplication of fiduciary property offense, the indictment failed to describe "money" and failed to describe the act or acts relied upon by the State to constitute the criminal conduct. He also argues that, with respect to the theft offense, the indictment failed to describe the manner and means by which appellant "appropriated" property from Pair.

*A.      Standard of Review and Governing Law*

The sufficiency of an indictment is a question of law. *Hughitt v. State*, 583 S.W.3d 623, 626 (Tex. Crim. App. 2019). We therefore review a trial court's decision to deny a motion to quash an indictment under a de novo standard. *Lawrence v. State*, 240 S.W.3d 912, 915 (Tex. Crim. App. 2007); *Williams v. State*, 499 S.W.3d 498, 499 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd); *see State v. Castorena*, 486 S.W.3d 630, 632 (Tex. App.—San Antonio 2016, no pet.) (stating that when resolution of question of law does not depend on credibility and demeanor

of witnesses, trial court is in no better position than appellate court to make determination, and de novo review is appropriate).

Both the United States and the Texas Constitution provide that a criminal defendant has the right to notice of the charges brought against him. *State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004); *see* U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation . . . ."); TEX. CONST. art. I, § 10 ("In all criminal prosecutions the accused . . . shall have the right to demand the nature and cause of the accusation against him, and to have a copy thereof."). Thus, the charging instrument—in this case, the indictment—must be specific enough to inform the accused of the nature of the accusation against him so that he may prepare a defense. *Moff*, 154 S.W.3d at 601; *see State v. Barbernell*, 257 S.W.3d 248, 250 (Tex. Crim. App. 2008).

The Code of Criminal Procedure also contains several provisions that provide guidance with respect to the specificity of an indictment. An indictment should state everything "which is necessary to be proved." *See* TEX. CODE CRIM. PROC. ANN. art. 21.03. The indictment must be certain enough "such as will enable the accused to plead the judgment that may be given upon it in bar of any prosecution for the same offense." *See id.* art. 21.04. And the indictment shall be sufficient if it

> charges the commission of the offense in ordinary and concise language
> in such a manner as to enable a person of common understanding to

know what is meant, and with that degree of certainty that will give the defendant notice of the particular offense with which he is charged, and enable the court, on conviction, to pronounce the proper judgment . . . .

*Id.* art. 21.11.

Generally, an indictment that tracks the language of the applicable statute will satisfy constitutional and statutory notice requirements. *Hughitt*, 583 S.W.3d at 626; *Moff*, 154 S.W.3d at 602. When a statutory term or element is defined by statute, the indictment does not need to allege the definition of the term or element. *State v. Zuniga*, 512 S.W.3d 902, 907 (Tex. Crim. App. 2017); *Barbernell*, 257 S.W.3d at 251. Typically, the definition of terms and elements are regarded as evidentiary matters. *Zuniga*, 512 S.W.3d at 907; *Barbernell*, 257 S.W.3d at 251. In some cases, however, an indictment that tracks the statutory language may be insufficient to provide a defendant with adequate notice. *Zuniga*, 512 S.W.3d at 907; *Barbernell*, 257 S.W.3d at 251. The Court of Criminal Appeals has stated:

> This is so when the statutory language fails to be completely descriptive. For example, a statute which uses an undefined term of indeterminate or variable meaning requires more specific pleading in order to notify the defendant of the nature of the charges against him. Likewise, when a statute defines the manner or means of commission in several alternative ways, an indictment will fail for lack of specificity if it neglects to identify which of the statutory means it addresses. In such cases, more particularity is required to provide adequate notice.

*Zuniga*, 512 S.W.3d at 907; *Barbernell*, 257 S.W.3d at 251; *see State v. Jarreau*, 512 S.W.3d 352, 354 (Tex. Crim. App. 2017) ("Generally, the State need not plead

with additional specificity those matters which are statutorily defined in the alternative where the matter is not an act or omission of the defendant.").

We engage in a two-step analysis when analyzing whether an indictment provides adequate notice. *Zuniga*, 512 S.W.3d at 907. First, we must identify the elements of the offense. *Id.* Second, we must consider whether the statutory language is sufficiently descriptive of the charged offense. *Id.*

### B.    *Analysis*

The indictment in this case provided as follows:

The duly organized Grand Jury of Fort Bend County, Texas, presents in the District Court of Fort Bend County, Texas, that in Fort Bend County, Texas, **KEVIN UNTRAY HINES**, hereafter styled the Defendant, heretofore on or about, and between **May 1, 2013 and July 10, 2014**,

#### Count I

pursuant to one scheme and continuing course of conduct, did, unlawfully appropriate property, namely, money of the aggregate value of $20,000 or more but less than $100,000.00, from Herbert Pair, hereinafter referred to as the owner, without the effective consent of the owner, and with the intent to deprive the owner of the property;

#### Count II

then and there intentionally, knowingly, or recklessly misapply property, to-wit: money, of the value of $20,000 or more but less than $100,000, that the said defendant held as a fiduciary or as a person acting in a fiduciary capacity, but not as a commercial bailee, contrary to an agreement under which the said defendant held the property, and in a manner that involved substantial risk of loss of the property to Herbert Pair, the owner of said property, and the person for whose benefit the property was held, by withdrawing money from the bank account without the consent of Herbert Pair and spending money from the bank account without the consent of Herbert Pair.

25

## 1. Description of 'Money"

In his second issue, appellant contends that the indictment was insufficient because it did not specifically describe the type of "money" that he allegedly stole or misappropriated. Appellant contends that the indictment should have specified whether "money" referred to United States currency, wire transfers, bank funds, or electronic transfers.

Code of Criminal Procedure article 21.09 provides that, "[i]f known, personal property alleged in an indictment shall be identified by name, kind, number, and ownership." TEX. CODE CRIM. PROC. ANN. art. 21.09. This Court has previously held that "[a]n allegation of theft of money over $750 dollars and under $20,000 is sufficient as to value and description." *Hendrick v. State*, 731 S.W.2d 147, 149 (Tex. App.—Houston [1st Dist.] 1987, pet. ref'd); *see Rovinsky v. State*, 605 S.W.2d 578, 581 (Tex. Crim. App. 1980) (not addressing merits of issue because complaint on appeal did not comport with motion to quash indictment, but stating, "[I]t is noted that the allegation of theft of over $10,000 current money of the United States is sufficient as to value and description"); *Cousins v. State*, 224 S.W.2d 260, 261 (Tex. Crim. App. 1949) ("The term 'money,' as used in relation to the crime of theft, has been judicially defined as legal tender coins or legal tender currency of the United States. Such, also is the definition of that term as commonly known and understood.") (internal citations omitted).

Here, Count One of the indictment alleged that appellant unlawfully appropriated "money of the aggregate value of $20,000 or more but less than $100,000.00" from Pair, and Count Two of the indictment alleged that appellant misapplied "money, of the value of $20,000 or more but less than $100,000." The indictment thus states the property that appellant allegedly stole or misapplied—money—and the aggregate value of that property—more than $20,000 but less than $100,000. This language is sufficient to provide notice to appellant; the State is not required to provide greater detail with respect to the type of money allegedly stolen or misapplied. *See Hendrick*, 731 S.W.2d at 149.

## 2. Description of Acts Constituting Criminal Offense

In his third issue, appellant contends that Count Two of the indictment—the misapplication of fiduciary property offense—was insufficient because the State did not state the particular transactions that the State was relying upon to constitute the offense.

Penal Code section 32.45 provides that a person commits the offense of misapplication of fiduciary property if the person "intentionally, knowingly, or recklessly misapplies property he holds as a fiduciary . . . in a manner that involves substantial risk of loss to the owner of the property or to a person for whose benefit the property is held." TEX. PENAL CODE ANN. § 32.45(b). The grade of the offense is determined by the value of property that is misapplied. *See id.* § 32.45(c)

27

(providing, for example, that offense is Class C misdemeanor if value of property misapplied is less than $100, but offense is first-degree felony if value of property misapplied is more than $300,000). Section 32.03 provides that "[w]hen amounts are obtained in violation of [Penal Code Chapter 32] pursuant to one scheme or continuing course of conduct, whether from the same or several sources, the conduct may be considered as one offense and the amounts aggregated in determining the grade of offense." *Id.* § 32.03; *id.* § 31.09 (providing same in context of theft cases pursuant to Penal Code Chapter 31).

The Court of Criminal Appeals has held, in both aggregated theft cases and aggregated misapplication of fiduciary property cases, that when each unauthorized transaction is a separate criminal act but the transactions together constitute the single offense of aggregated theft or misapplication of fiduciary property, "details regarding the specific acts on which the State intends to rely are not required to be listed in the indictment, as long as they are provided by some other means." *See Moff*, 154 S.W.3d at 603; *Kellar v. State*, 108 S.W.3d 311, 313 (Tex. Crim. App. 2003); *Castorena*, 486 S.W.3d at 633–34. In *Moff*, a misapplication of fiduciary property case in which the chief appraiser of a county appraisal district allegedly used money and credit cards to make numerous purchases over a seven-year period, the indictment, although it correctly tracked the language of the statute, was "not sufficient to fulfill the constitutional and statutory requirements of specificity." 154

28

S.W.3d at 603. The Court of Criminal Appeals noted that "[i]t is unreasonable to require the defendant to gather evidence and prepare a defense for each of the credit card and cash transactions he made during the seven-year time frame in the indictment," and, thus, "additional information that is reasonably necessary for the defense to prepare its case must be provided." *Id.* The court then stated, "This is not to say that the State must lay out its case in the indictment, only that the defendant must be informed of the specific transactions that allegedly violate the statute." *Id.*; *see also Kellar*, 108 S.W.3d at 313 (stating that criminal defendant has "a constitutional right to sufficient notice so as to enable him to prepare a defense," but this due process requirement "may be satisfied by means other than the language in the charging instrument").

When a trial court overrules a motion to quash an indictment, "a defendant suffers no harm unless he did not, in fact, receive notice of the State's theory against which he would have to defend." *Kellar*, 108 S.W.3d at 313. The State may satisfy this obligation through pre-trial discovery by providing documentation of the unauthorized transactions on which it intends to rely at trial. *See id.* at 314 (concluding that State satisfied its obligation when it produced four binders documenting 149 alleged unauthorized transactions and provided itemized of transactions upon which it intended to rely); *Castorena*, 486 S.W.3d at 634 (stating, in aggregate misapplication of fiduciary property case, that no constitutional

violation based on lack of notice existed because State filed business records affidavit with cell phone records on which it intended to base its prosecution).

Here, the indictment alleged two offenses: aggregate theft and aggregate misapplication of fiduciary property. The indictment did not specify the particular alleged unauthorized transactions made by appellant, but, because these were both aggregate offenses, the State was not required to specifically list these transactions in the indictment. *See Moff*, 154 S.W.3d at 603; *Kellar*, 108 S.W.3d at 313; *Castorena*, 486 S.W.3d at 633–34. At the hearing on the motion to quash the indictment, defense counsel acknowledged that he had received discovery from the State that included police offense reports and banking records, including records of the wire transfers that Pair made and account statements from the First Convenience account, which itemized the deposits being made into the account as well as the withdrawals from the account. The State's discovery log reflects that, in addition to the banking records for the First Convenience account, the State also provided to appellant business records from several businesses that allegedly received funds from the First Convenience account, including Southwest Airlines, GoDaddy.com, Hilton Hotels, and a Harris County Justice of the Peace. The State produced records from May 2013 through December 2013.[6]

---

[6]     On appeal, appellant characterizes these records as "voluminous." The documents admitted at trial reflecting the wire transfers that Pair made, as well as Pair's bank records for his bank account in Alabama, total 81 pages. The documents admitted

The State conducted pre-trial discovery that included issuing subpoenas for banking records and records from businesses to determine the amounts that Pair transferred to the First Convenience account and the amounts that appellant allegedly withdrew from that account and used to pay his personal expenses. The State then provided these records to appellant before trial. Based on the discovery that occurred pre-trial and that was provided to appellant, we conclude that appellant had sufficient notice of the allegedly unauthorized acts that the State was relying upon to constitute the offense of misapplication of fiduciary property. *See Kellar*, 108 S.W.3d at 314; *Castorena*, 486 S.W.3d at 634.

### 3.     Description of Alleged "Appropriation" of Pair's Property

Finally, in his fourth issue, appellant contends that Count One of the indictment—the theft charge—failed to provide him with adequate notice of how he allegedly appropriated Pair's property. Specifically, appellant points out that the Texas Penal Code defines "appropriation" in two ways, but the indictment did not specify the manner by which appellant allegedly appropriated property from Pair.

---

at trial reflecting records from First Convenience Bank total 110 pages. The documents admitted at trial from other businesses total 13 pages. This is not, therefore, a situation in which "the information necessary to provide notice is buried somewhere in a mass of documents turned over to the defendant" and the State "ambushed" appellant. *See State v. Moff*, 154 S.W.3d 599, 603 (Tex. Crim. App. 2004).

Penal Code section 31.03(a) provides that a person commits the offense of theft if he "unlawfully appropriates property with intent to deprive the owner of property." TEX. PENAL CODE ANN. § 31.03(a). Section 31.01(4) defines "appropriate" in two ways:

(A) to bring about a transfer or purported transfer of title to or other nonpossessory interest in property, whether to the actor or another; or

(B) to acquire or otherwise exercise control over property other than real property.

*Id.* § 31.01(4). Appropriation of property is unlawful if, among other ways not relevant here, it is without the owner's effective consent. *Id.* § 31.03(b)(1).

a. *Whether indictment must specify definition of "appropriate"*

The State cites the Court of Criminal Appeals' decision in *Lewis v. State*, 659 S.W.2d 429 (Tex. Crim. App. 1983), for the proposition that it was not required to specify in the indictment which statutory definition of "appropriate" it would rely upon. Court of Criminal Appeals cases decided before *Lewis* held that the indictment must specify the particular definition of "appropriate" and that failure to do so did not provide adequate notice to the defendant. *See McBrayer v. State*, 642 S.W.2d 504, 506 (Tex. Crim. App. 1982); *Coleman v. State*, 643 S.W.2d 124, 126 (Tex. Crim. App. 1982); *Gorman v. State*, 634 S.W.2d 681, 683–84 (Tex. Crim. App. 1982). In *Lewis*, the indictment alleged that the defendant appropriated one television and three telephones "without any consent of any kind," but did not

specify the particular statutory definition of "appropriate" the State intended to rely upon. *See* 659 S.W.2d at 430. The Court of Criminal Appeals emphasized the "without any consent of any kind" language in its analysis and concluded that the indictment, "read as a whole, gave adequate notice that the term 'appropriate' referred only to" the second statutory definition of "appropriate"—acquiring or otherwise exercising control over property—and therefore the trial court did not err by refusing to quash the indictment.[7] *Id.* at 432–33; *see Huff v. State*, 897 S.W.2d 829, 834 (Tex. App.—Dallas 1995, pet. ref'd) ("When, as in this case, the indictment alleges an appropriation without consent of any kind, it necessarily alleges an appropriation under subsection (B).").

Three years after *Lewis*, in *Coats v. State*, the Court of Criminal Appeals held that money could be appropriated in both of the manners set out in the statutory definition of "appropriate": money could be appropriated "either by acquiring or otherwise exercising control over property, or by bringing about a transfer of title or other nonpossessory interest in the property." 712 S.W.2d 520, 523 (Tex. Crim. App. 1986). As a result, indictments alleging the theft of money need to further define "appropriate" to specify which statutory definition the State intended to rely upon.

---

[7]    Although the Court of Criminal Appeals ultimately held that the trial court did not err by refusing to quash the indictment, the court also stated, "[W]e do not commend this method of alleging the statutory variant of 'appropriate' under [Penal Code] § 31.01(5)(B) . . . ." *Lewis v. State*, 659 S.W.2d 429, 432 (Tex. Crim. App. 1983).

*See id.* ("Insofar as the Court of Appeals held that the term 'appropriate' need not be further defined when the property alleged to have been stolen is cash money, it is mistaken."); *Smith v. State*, 761 S.W.2d 546, 548 (Tex. App.—Corpus Christi–Edinburg 1988, no pet.) ("In a theft case, the defendant may require the State to specify in which manner he allegedly appropriated the property.").

Here, the indictment, which did not specify a particular statutory definition of "appropriate," did not allege that the appropriation was "without consent of any kind," as the indictment did in *Lewis*. *See Coats*, 712 S.W.2d at 521 n.2 ("This Court has carved out what appears to be a limited exception to the *Gorman* rule in instances where the indictment further alleges that the appropriation was without consent of any kind."). Instead, the indictment alleged that the appropriation was "without the effective consent of the owner."

We assume, without deciding, that the indictment was required to further define "appropriate" to specify the particular statutory definition of that term that the State intended to rely upon. *See, e.g.*, *id.* at 523; *Washington v. State*, 675 S.W.2d 239, 240 (Tex. App.—Waco 1984, no pet.) ("Our Court of Criminal Appeals has consistently ruled that a theft indictment that simply alleges unlawful appropriation of property without the effective consent of the owner is subject to being quashed because, in light of the several methods of 'appropriation' set forth in the Penal Code definition of the term, such indictment does not give the defendant adequate and fair

34

notice of the theft charge against him since it does not specify the method of appropriation used."); *see also Zuniga*, 512 S.W.3d at 907 (stating that when statute defines manner or means of commission of offense in several alternate ways, indictment must specify particular manner and means State is relying upon). We therefore turn to whether the failure to do so harmed appellant.

### b. Harm analysis

"A ground for an exception to the form of an indictment exists if the indictment fails to allege facts sufficient to give the defendant notice of the precise offense with which he is charged." *Sanchez v. State*, 120 S.W.3d 359, 367 (Tex. Crim. App. 2003); *Valero Ref.-Tex. L.P. v. State*, 203 S.W.3d 556, 564 (Tex. App.—Houston [14th Dist.] 2006, no pet.) ("When the State fails to allege facts sufficient to give a defendant notice of the precise offense charged and to bar subsequent prosecutions for the same offense, the defect is one of form.").

Under Code of Criminal Procedure article 21.19, even when there is a showing that the trial court erred by refusing to quash an indictment based on a defect in form, we may affirm the conviction "as long as the defect did not prejudice the defendant's substantial rights." *Sanchez*, 120 S.W.3d at 367; TEX. CODE CRIM. PROC. ANN. art. 21.19 ("An indictment shall not be held insufficient, nor shall the trial, judgment or other proceedings thereon be affected, by reason of any defect of form which does not prejudice the substantial rights of the defendant."). The first step of a harm

analysis under article 21.19 is to determine whether the indictment "failed to convey some requisite item of 'notice.'" *Sanchez*, 120 S.W.3d at 367 (quoting *Adams v. State*, 707 S.W.2d 900, 903 (Tex. Crim. App. 1986)). If the indictment did not give sufficient notice, "the next step is to decide whether in the context of the case, this had an impact on the defendant's ability to prepare a defense, and, finally, how great an impact." *Id.* (quoting *Adams*, 707 S.W.2d at 903). We consider the entire record in making this determination. *Adams*, 707 S.W.2d at 903.

Here, appellant was charged in a two-count indictment with an aggregated theft offense and an aggregated misapplication of fiduciary property offense. We have already determined, in addressing appellant's third issue, that because these are aggregated offenses, the State was not required to list the particular allegedly unauthorized transactions in the indictment itself as long as the State provided notice of the unauthorized acts in some other manner, which the State did through pre-trial discovery. Appellant, therefore, had sufficient notice of the alleged unauthorized transactions that the State would rely upon to prove the charged offenses. The question in appellant's fourth issue is whether the State's failure to specify in the indictment the statutory definition of "appropriate" that it intended to rely upon— whether appellant appropriated money from Pair by "bring[ing] about a transfer or purported transfer of title to or other nonpossessory interest in property" or by "acquir[ing] or otherwise exercise[ing] control over property other than real

property"—prejudiced appellant's substantial rights by impacting his ability to prepare a defense. We conclude that this failure did not prejudice appellant's substantial rights.

At trial, Pair testified concerning his communications with appellant, including appellant's proposal to assist Pair in obtaining a small business loan by opening a joint account and transferring money into that account to show prospective lenders that Pair's business had a positive cash flow and was creditworthy. Pair testified that he agreed to this plan, that appellant opened up an account at First Convenience Bank in Missouri City, and that, at appellant's behest, Pair began wire-transferring funds into the account. Pair also testified that appellant never sent him any documentation concerning the account, such as a signature card or a debit card, that he never obtained a loan, that appellant did not return over $22,000 that Pair transferred into the account over a period of several months, and that Pair did not authorize appellant to pay his personal expenses from the First Convenience account. The trial court admitted evidence including Pair's bank records, wire-transfer records, account documents and statements for the First Convenience account that demonstrated that appellant was the only signatory on the account and that transactions were made from the account at local Missouri City businesses near where appellant lived, and text messages between Pair's phone and appellant's

phone, in which appellant asked Pair to transfer funds to the First Convenience account.

Appellant presented a multi-faceted defense. He primarily attacked Pair's credibility, pointing to two checks drawn on the First Convenience account to which Pair admitted forging appellant's signature and pointing to Pair's admission that some of the funds that he had wire-transferred to the First Convenience account came from a joint account Pair had with his elderly uncle, who did not know that Pair was taking money from that account. Appellant testified that he was introduced to Pair when Pair called appellant's phone, asking to speak with a family friend of appellant's who was living with appellant at the time. According to appellant, this family friend had access to appellant's phone, including his email and his text messages.

Appellant acknowledged opening the First Convenience account in Missouri City, which he claimed he did because Pair was planning to move to the Houston area and Pair had asked appellant to open the account for him, but he testified that he sent all documentation and debit cards for the account to Pair and that Pair had access to the account. Appellant also testified that Pair sent money to him as a gift because Pair wanted to be in a relationship with appellant. He acknowledged that he occasionally used funds from the First Convenience account, but he claimed that he did so with Pair's permission. He testified that he did not have an agreement with

38

Pair to help him obtain a loan; instead, he stated that Pair concocted the loan scheme once Pair's uncle discovered that Pair had been taking money from the joint account Pair held with his uncle in Alabama. Appellant testified that he started sending money back to Pair in August or September 2013. Finally, appellant disputed specific transactions listed in the account statements for the First Convenience account, arguing that some of them had occurred on dates when he was in the hospital receiving treatment for cancer.

The only mention of the two statutory definitions of "appropriate" occurred during voir dire, when defense counsel stated:

> And there are certain ways that you can appropriate property, which means that you can dispossess somebody of their property. And it's one of two ways. You can appropriate somebody's property by stealing the property directly or by bringing about a transfer of the property. So those are the two ways that you can appropriate somebody's property, which is going to be pivotal in this case as part of—in fact, when y'all receive the law from the Judge, that's going to be defined in the indictment of how the State has proven or not proven how Mr. Hines appropriated somebody's property.

The jury charge included both statutory definitions of "appropriate." Defense counsel did not object to the inclusion of both definitions in the charge, and neither defense counsel nor the State argued during closing argument about the method by which Pair's money was appropriated or referred to the statutory definitions of "appropriate." Defense counsel's strategy did not hinge on whether the appropriation of Pair's money involved "bring[ing] about a transfer or purported transfer of title

to or other nonpossessory interest in property" or whether the appropriation involved "acquir[ing] or otherwise exercise[ing] control over property other than real property."

Based on this record, we conclude that the State's failure to specify in the indictment the particular statutory definition of "appropriate" that it intended to rely upon did not impact appellant's ability to prepare a defense and, therefore, the trial court's failure to quash the indictment on this basis did not prejudice appellant's substantial rights. *See Sanchez*, 120 S.W.3d at 367; *Adams*, 707 S.W.2d at 903. We hold that the trial court's failure to quash the indictment was harmless.

We overrule appellant's second, third, and fourth issues.

## Conclusion

We affirm the judgment of the trial court.



Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Lloyd, and Hightower.

Publish. TEX. R. APP. P. 47.2(b).